USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/26/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE CORTLANDT LIQUIDATING LLC

    Debtors.

---

LINCOLN TRIANGLE COMMERCIAL HOLDING CO. LLC,

    Appellant,

-against-

ALAN D. HALPERIN *solely in his capacity as Plan Administrator of Cortlandt Liquidating LLC*,

    Appellee.

---

1:23-cv-03262-MKV

OPINION AND ORDER AFFIRMING ORDER OF BANKRUPTCY COURT WITH RESPECT TO CLAIM 1066

MARY KAY VYSKOCIL, United States District Judge:

    This bankruptcy appeal arises out of certain issues relating to the proper computation of the statutory cap on recovery of rent indebtedness by a lessor raised in connection with proofs of claim filed against the bankruptcy estate of the iconic New York City institution, Century 21 Department Store, and its affiliates. Specifically, Appellant Lincoln Triangle Commercial Holding Co. LLC ("Appellant") appeals from a final order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), granting Appellee's objection to Appellant's Proof of Claim 1066, *see* Bankruptcy Case No. 20-bk-12097 (MEW) ("Bank. Dkt."), [ECF No. 1391] and certain interim orders, *see* Bank. Dkt. [ECF Nos. 1261, 1360], incorporated therein. For the reasons discussed below, the Orders of the Bankruptcy Court are hereby AFFIRMED.

# BACKGROUND[1]

*The Lease and Guaranty*

Over a decade ago, Appellant, as landlord, and C21 1972 Broadway LLC ("Tenant"), as tenant, entered into a lease agreement ("Lease") for non-residential real property located at 1972 Broadway, New York, New York ("the Property"). Bank. Dkt., Interim Opinion and Order Granting in Part Objections to Proof of Claim 1066 dated May 20, 2022 [ECF No. 1261] ("Interim Order"). Pursuant to an accompanying guaranty agreement, Century 21 Department Stores LLC ("the Debtor-Guarantor") guaranteed the payment, performance, and observance of all of Tenant's obligations under the Lease, in lieu of a cash security deposit. Interim Order at 1.

Additionally, the Tenant's obligations under the Lease were secured by a Letter of Credit issued by JPMorgan Chase Bank, N.A. ("JPMorgan"), which was posted by the Tenant but funded by the Debtor-Guarantor. Interim Order at 9. Specifically, the Letter of Credit identifies the Tenant as "Applicant," Debtor-Guarantor as "Obligor," and Appellant as "Beneficiary." Interim Order at 9; *see also* Opposition Brief of Alan D. Halperin [ECF No. 7] ("Appellee Br."), Ex. 1 at PAA-223.

*Underlying Chapter 11 Cases*

On September 10, 2020, C21 Department Stores and certain affiliates, including the Debtor-Guarantor, (collectively, "the Debtors"), each commenced a voluntary case under Chapter 11 of the Bankruptcy Code. Bank. Dkt., [ECF No. 1]. The cases were procedurally consolidated for joint administration.[2] Bank. Dkt., [ECF No. 3]. Shortly thereafter, the Debtors filed a *Notice*

---

[1] The parties did not submit a joint statement of facts for purposes of this motion, and to the Court's knowledge, there was no undisputed statement of facts in the Bankruptcy proceeding. Nonetheless, the grounds for appeal are almost exclusively legal, and the parties—through their briefing—seem largely in agreement with respect to the limited underlying background facts. Accordingly, all facts are undisputed according to the representations made in the parties' briefing on this motion, unless otherwise noted.

[2] In April 2021, the Bankruptcy Court entered Findings of Fact, Conclusions of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming

2

*of Rejection of Executory Contracts and Unexpired Leases*, seeking to reject the Lease and related documents, including the Guaranty.  Bank. Dkt., [ECF No. 110].

Appellant Landlord objected to the Lease Rejection on the grounds that, since Tenant was not one of the Chapter 11 Debtors, the Tenant lacked the power to reject the Lease under the Bankruptcy Code.  Bank. Dkt., [ECF No. 120].  In response, the Debtors filed a corrected notice to remove the Lease from the schedule of leases and contracts to be rejected.  Bank. Dkt., [ECF No. 174].  Two days later, on October 9, 2020, and after the Chapter 11 cases had been filed but before the expiration of the term of the Lease, Tenant vacated the Property and delivered the keys to Appellant Landlord undisputedly in breach of the Lease.  Interim Order at 2.  Tenant paid no additional rent under the Lease after that date.  *Id*.

Appellant confirmed in writing that it refused to accept termination of the Lease by Tenant.  Interim Order at 2.  Instead, Appellant drew down the full balance of the Letter of Credit (approximately $7.6 million) and held the proceeds as cash security for the Lease.  *Id*.  Appellant asserts that, after Tenant turned in the keys and vacated the Property, it withdrew on a monthly basis proceeds of the Letter of Credit to cover rent and other Lease obligations due for the vacant Property.  *Id*.  The parties agree that Debtor-Guarantor's outstanding obligations to JPMorgan with respect to the Letter of Credit, were subsequently satisfied in full from *estate assets* on the Effective Date of the Plan in accordance with its terms.  Appellee Br., Ex. 1 at PAA-066; Interim Order at 2.

***Appellant's Claim***

On December 9, 2020, Appellant Landlord filed a proof of claim ("Claim 1066" or the "Claim") in the Chapter 11 cases asserting a claim of $44,378,698.04 for estimated damages

---

Debtors' First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (the "Confirmation Order").  Bank. Dkt., [ECF No. 883].

resulting from breach of the Lease consisting of, briefly: (a) amounts for future rents as provided in the Lease; (b) amounts for future real estate taxes, operating expense escalations, and utilities and repairs; and (c) actual amounts for cleanup costs, mechanic's liens, and window repairs. Interim Order at 2.

Appellee, as Plan Administrator,[3] objected to the Claim ("the Objection"), arguing that: (a) Section 502(b)(6) of the Bankruptcy Code applied to cap damages Appellant sought; (b) the "time approach" should be used to calculate termination damages under Section 502(b)(6); (c) the Lease termination damages must only include those items that may be properly classified as "rent reserved" under Section 502(b)(6); (d) the projected future "rent reserved" used to calculate the Claim must reflect reasonable assumptions calculated consistent with historical data; and (e) the Letter of Credit held as security for the Property must be applied to reduce the capped Lease damages. *Id*.

**Bankruptcy Court's Relevant Orders on Appellant's Claim**

On May 20, 2022, Judge Chapman, to whom the Chapter 11 cases were originally assigned, entered an Interim Order [ECF No. 1261] [ECF No. 1261] (the "Interim Order"), holding, *inter alia*, that Section 502(b)(6) applies to cap the claims of a lessor against a debtor-guarantor under a lease. Additionally, Judge Chapman found that, in this case, the Lease was terminated for purposes of Section 502(b)(6), and therefore, the Appellant's Claim is subject to the damages cap in Section 502(b)(6). Interim Order at 4. The Interim Order further found that "uncontroverted evidence" established that the Letter of Credit was satisfied with estate assets pursuant to the Plan, and thus, such Letter of Credit should be deducted from Appellant's Claim to reduce such claim after the Section 502(b)(6) calculation is complete. *Id*. at 9. Judge Chapman expressly declined

---

[3] Under the Confirmation Order, Appellee was appointed as Plan Administrator to administer the Debtors' remaining consolidated estate in accordance with the Plan. [ECF No. 883].

4

to rule on the ultimate calculation of damages under Section 502(b)(6) or whether certain "Additional Damages," including the Cleanup Costs at issue on this appeal, qualified as "rent reserved" under Section 502(b)(6). *Id*.

After Judge Chapman retired from the Bankruptcy Court at the end of January 2022, the Chapter 11 cases were reassigned to Judge Wiles, who subsequently issued an order regarding certain Section 502(b)(6) computation issues raised by Appellee's Objection to Appellant's Claim and the Interim Order. Bank. Dkt., [ECF Nos. 1359] ("502(b)(6) Computation Order"). In the 502(b)(6) Computation Order, Judge Wiles held:

i. The Section 502(b)(6) damages cap with respect to Appellant's Claim is to be calculated using the "Time Approach" (*i.e.*, by reference to the rents reserved under the relevant leases for the first fifteen percent of the remaining lease terms);

ii. The Cleanup Costs sought by Appellant (if proved) would constitute damages arising from the termination of the lease for purposes of Section 502(b)(6); and

iii. None of the "Additional Damages" (including Cleanup Costs) sought by Appellant would constitute "rent" for purposes of calculating the amount of the Section 502(b)(6) damages cap applicable to the Claim.

*See* 502(b)(6) Computation Order. Judge Wiles simultaneously issued a decision explaining his reasoning for the rulings in the 502(b)(6) Computation Order. That decision is reported at 648 B.R. 137 (Bankr. S.D.N.Y. 2023). Thereafter, the parties conferred and agreed on a claim calculation in accordance with the rulings set forth in the Interim Order and the 502(b)(6) Computation Order. On March 31, 2023, Judge Wiles entered an Order sustaining Appellee's Objection to Appellant's Claim, and incorporating the prior holdings set forth in the Interim Order and 502(b)(6) Computation Order. Bank. Dkt., [ECF No. 1391] ("March 31 Order").

**Appellant's Appeal to this Court**

Appellant has now appealed the March 31 Order to this Court. In support of its appeal,

Appellant filed a brief [ECF No. 6] ("Appellant Br."). Appellee filed an opposition brief [ECF No. 7] ("Appellee Br."), and Appellant filed a reply [ECF No. 11] ("Reply").

## STANDARD OF REVIEW

On an appeal from the Bankruptcy Court, a District Court reviews *de novo* conclusions of law, *see Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 152 (2d Cir. 2016) (citing *In re Petrie Retail, Inc.*, 304 F.3d 223, 228 (2d Cir. 2002)), while reviewing findings of fact for clear error. *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000)). A finding of fact is clearly erroneous only if this Court is "left with the definite and firm conviction that a mistake has been committed." *Adler v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 855 F.3d 459, 469 (2d Cir. 2017). Although the Bankruptcy Court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden. *H & C Dev. Group, Inc. v. Miner* (*In re Miner*), 229 B.R. 561, 565 (B.A.P. 2d Cir. 1999).

## DISCUSSION

**I. The Bankruptcy Court Correctly Held That Section 502(b)(6) Caps Appellant's Claim.**

Appellant first argues that the Bankruptcy Court erred in holding that its Claim is subject to, and limited by, Section 502(b)(6) for two reasons: (1) Appellant was not a lessor to the Debtor-Guarantor or any of the other Debtors in the Chapter 11 cases, and (2) the Lease was neither terminated nor was it rejected by a debtor in a bankruptcy case under the Bankruptcy Code. Appellant Br. at 7. Both arguments fail.

    A. The Section 502(b)(6) Cap Applies to a Lessor Claim Against a Debtor-Guarantor Under a Lease.

Section 502 of the Bankruptcy Code deals generally with the allowance of claims. A lessor's claim for "damages resulting from the termination of a lease of real property" is allowed, but not always in full. 11 U.S.C. § 502(b)(6). Under Section 502, there is a "cap" on the amount

6

of damages recoverable in bankruptcy for termination of a lease of real property. Specifically, Section 502(b)(6) provides that: "the court . . . shall determine the amount of such claim . . . and shall allow such claim in such amount, *except to the extent that . . . if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property*," such claim exceeds "the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease." 11 U.S.C. § 502(b)(6) (the "Rent Cap" or the "Cap") (emphasis added).

By its terms, the statute does not explicitly address whether it applies with respect to a claim against a *guarantor*/debtor of a lease as opposed to a tenant/debtor. Nor has the Second Circuit addressed the question of whether the Section 502(b)(6) Cap applies to a lease guarantor. However, by its terms, the statute simply does not distinguish among types of debtors.

In concluding that the Section 502(b)(6) Cap *does* apply to a lease guarantor, the Bankruptcy Court expressly noted that courts that have addressed the issue "have held that section 502(b)(6) applies to limit claims of a lessor for damages for the termination of a lease whether the debtor is the lessee itself or is a guarantor of the lease." Interim Order at 7 (citing *In re Ancona*, 2016 WL 828099, at *5 (Bankr. S.D.N.Y. 2016) (collecting cases and noting that most courts that have considered the issue have held that the cap applies to claims against a debtor-guarantor of the lease); *see also In re Episode USA, Inc.*, 202 B.R. 691, 695 (Bankr. S.D.N.Y. 1996); *In re Flanigan*, 374 B.R. 568, 575–76 (Bankr. W.D. Pa. 2007) (concluding that Section 502(b)(6) applies not only to limit landlord claims against tenants in bankruptcy, but also in instances where guarantors of such leases seek bankruptcy protection); *see also In re Arden*, 176 F.3d 1226 (9th Cir. 1999); *In re Henderson*, 297 B.R. 875 (Bankr. M.D. Fla. 2003); *In re Farley, Inc.*, 146 B.R. 739 (Bankr. N.D. Ill. 1992); *In re Interco, Inc.*, 137 B.R. 1003 (Bankr. E.D. Mo. 1992); *In re Thompson*, 116 B.R. 610 (Bankr. S.D. Ohio 1990).

As the *Ancona* Bankruptcy Court makes clear, the goal behind the statutory damages cap is to compensate a lessor for his damages, while at the same time ensuring that the landlord's claim is not permitted to be so large that other general unsecured creditors are unable to get recovery from the estate. *Ancona*, 2016 WL 828099, at *1. To achieve this goal, the statute speaks not to a particular debtor entity, but rather to the amount of damages recoverable from the estate. *See Episode USA, Inc.*, 202 B.R. at 695 ("[t]he thrust of the § 502(b)(6) cap is not directed toward any particular debtor entity; rather, it acts to limit the amount of damages the lessor may be allowed from the bankruptcy estates"). The legislative history to Section 502(b)(6) confirms that the policy behind the statutory "Cap" is to "compensate the landlord for his loss while not permitting a claim so large (based on a long term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." H.R.Rep. No. 595, 95th Cong., 2d Sess. 63 (1978) S.Rep. No. 95–989, at 63 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5849.

While Appellant argues that the Bankruptcy Court's decision relies on *In re Ancona*, 2016 WL 828099 (Bankr. S.D.N.Y. 2016), which it contends is an "unreported decision, [that] has no real precedential value," Appellant at the same time argues that the Bankruptcy Court erred when it "summarily dismiss[ed]" the reasoning of the courts in *In re Danrik, Ltd.*, 92 B.R. 964 (Bankr. N.D. Ga. 1988), an over thirty year old Northern District of Georgia case, and *In re Dronebarger*, 2011 WL 350479 (Bankr. W.D. Tex. 2011), an unreported decision from the Western District of Texas. Appellant Br. at 9.

The decision in *Ancona* is directly on point, and Appellant's citations are distinguishable from this case. First, in *In re Danrik, Ltd.*, the bankruptcy court for the Northern District of Georgia addressed whether Section 502(b)(6) limits a claim against a *solvent* debtor who had guaranteed a lease, where the guarantor-debtor was solvent, all other claims were paid in full, the

8

claim sought by the landlord was not disproportionately large ($470,000),[4] and the solvent debtor had escrowed sufficient funds to satisfy the claim in full. 92 B.R. 964. Second, *In re Dronebarger* involved a claim based on a stipulated judgment for damages arising from certain casualty and repair and restore covenants in a lease that had expired by its terms *seven years before the bankruptcy filing*. 2011 WL 350479, at *15. The bankruptcy court held that through the Section 502(b)(6) damages cap, "Congress intended to compensate landlords for their actual damages while placing a limit on large *speculative* damages . . . [and Congress was] primarily concerned with limiting a landlord's claim for '*future rent*,' [] not claims arising from pre-bankruptcy events." *Id*. at *13 (emphasis added). In this case, however, Appellant's Claim is based almost entirely on future rent, which is exactly the type of speculative and large claim Section 502(b)(6) is intended to limit in order to preserve estate assets to ensure recovery by other creditors. *See Ancona*, 2016 WL 828099, at *1.

       The Court finds that the Bankruptcy Court did not err in holding that the Section 502(b)(6) Cap applies to a lease guarantor. The overwhelming majority of courts that have considered the issue have found the same. Indeed, such a holding is consistent with the goal of the statutory cap to prevent disproportionately large claims for future rent under a lease to disadvantage other unsecured creditors. *Ancona*, 2016 WL 828099, at *1; *see also In re Episode USA*, 202 B.R. at 695; *In re Ancona*, 2016 WL 828099, *5; *In re Arden*, 176 F.3d at 1229 ("A plain reading of the section underscores that it is the claim of the lessor, not the status of the lessee-or its agent or guarantor-that triggers application of the Cap.")

---

[4] Appellant's Claim here for $44,378,698.04 is almost 100 times the amount found not disproportionately large in *In re Danrik, Ltd*. 92 B.R. 965.

9

> B. The Lease was Terminated for Purposes of
> Section 502(b)(6) and the Statutory Cap Applies.

As previously noted, Section 502(b)(6) allows for a lessor's claim for "damages resulting from the *termination* of a lease of real property," but mandates that such damages are subject to a "Cap." 11 U.S.C. § 502(b)(6) (emphasis added). It is uncontested in this case that on October 9, 2020, after the Chapter 11 cases had been filed but before the expiration of the term of the Lease, Tenant vacated the Property and delivered the keys to Appellant indisputably in breach of the Lease. Interim Order at 2. However, Appellant confirmed in writing that it refused to accept termination and did not subsequently treat the Lease as terminated, continuing to charge unpaid monthly rents and other accruing Lease obligations against the proceeds of the drawn letter of credit. *Id*. Appellant contends that, as such, the Bankruptcy Court erred in holding that its Claim is subject to Section 502(b)(6), because Appellant refused to accept turnover of the Property, and, thus, under New York law, the Lease was never actually terminated. Appellant Br. at 7.

The Bankruptcy Court noted that, as a general matter, "the standard for termination of a lease by operation of New York state law, [] requires both the landlord and the tenant to take unambiguous actions indicating that each party views the lease as terminated before a court will find an effective termination of the lease." Interim Order at 7 (citing *Brock Enters. v. Dunham's Bay Boat Co.*, 292 A.D.2d 681, 682 (3d Dept. 2002)). "Termination" is not, however, defined for purposes of the Bankruptcy Code. As the Bankruptcy Court emphasized, "bankruptcy courts have held that 'termination' under section 502(b)(6) of the Bankruptcy Code 'has a slightly *broader* meaning than the same term of art used under state landlord-tenant law.'" Interim Order at 2. "[T]ermination under section 502(b)(6) may in fact include circumstances where[, as here,] a lease is 'functionally dead,' such as circumstances where there is an uncured breach of a lease coupled with an intentional abandonment of the premises to the landlord, similar to rejection." Interim

10

Order at 7 (emphasis added) (quoting *In re Flanigan*, 374 B.R. at 576–78).

Appellant responds by pointing to *In re Dronebarger*, 2011 WL 350479 (Bankr. W.D. Tex. 2011), which discussed Texas state law in determining whether there was a "termination" for purposes of the Section 502(b)(6) damages cap.  2011 WL 350479, at *9.  Admittedly, there is little to no case law on the definition of "termination" with respect to the Section 502(b)(6) cap. And, as raised by Appellant, there does appear to be diverging case law on determining whether a Lease has been terminated for purposes of the cap.  Moreover, none of the case law cited—either by the Bankruptcy Court or Appellant—is binding precedent.  Nevertheless, the Court agrees with the Bankruptcy Court's reasoning that it would be antithetical to the purpose of Section 502(b)(6) to allow a landlord to avoid application of the damages cap by seizing on a technicality in state law to refuse to accept a surrender of the premises after the lessee has intentionally abandoned the premises.  *See* Interim Order at 8 (citing *In re Flanigan*, 374 B.R. at 577 (noting that "[i]f 'termination' for purposes of § 502(b)(6) of the Bankruptcy Code equated to state law termination of the lease only, landlords could always avoid the damages cap in § 502(b)(6) by simply not 'terminating' the lease . . . and instead cause accelerated rent claims to swallow the assets available for distribution to creditors in any given bankruptcy.  Congress surely did not intend the statute to work this way.")); *see also In re MDC Sys., Inc.*, 488 B.R. 74, 86 (Bankr. E.D. Pa. 2013).

Accordingly, the Court finds that the Bankruptcy Court did not err in holding that when Tenant handed over the keys and intentionally abandoned the Property, in clear breach of the Lease, the Lease became "functionally dead," and thus, terminated for purposes of the Section 502(b)(6) Cap.[5]

---

[5] Additionally, as Appellee correctly notes, even if the Court held that the Lease was not "functionally dead," Section 502(b)(6) would nonetheless apply.  While certain courts equate a lease rejection under Section 365 of the Bankruptcy Code with termination, even those courts that do not *still* routinely cap the landlord damages pursuant to Section 502(b)(6).  *See e.g.*, *In re Austin Dev. Co.*, 19 F.3d 1077, 1082 n.9 (5th Cir.), *cert. denied*, 513 U.S. 874 (1994); *In re Mr. Gatti's*, 162 B.R. 1004, 1012–13 (Bankr. W.D. Tex. 1994); *In re Emple Knitting Mills, Inc.*, 123 B.R. 688, 691

## II. The Bankruptcy Court Correctly Held That the Section 502(b)(6) Cap Should Be Calculated in Accordance With the "Time Approach."

Appellant next contends that, even if its Claim is limited by the Section 502(b)(6) damages cap, the Bankruptcy Court erred in holding that the cap should be calculated using the "Time Approach" rather than the "Rent Approach." Appellant Br. at 7. The difference in the approaches turns on the proper interpretation of the language of Section 502(b)(6). The "Rent Cap" in Section 502 states that "the court . . . shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that . . . if such claim is the claim of a lessor for damages resulting from the termination" of a real property lease, such claim exceeds "*the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease* . . . ." 11 U.S.C. § 502(b)(6) (emphasis added).

The Plan Administrator, in objecting to Appellant-Landlord's claim urged, and Judge Wiles held, that Section 502 imposes a cap equal to the rent that is reserved under the relevant lease for a specified *time period* (i.e., the "Time Approach"). Judge Wiles went on to explain that the Plan Administrator's position is "that time period is equal to 15 percent of the remaining lease term, so long as that time period is at least one year and no more than three years." *See In re Cortlandt Liquidating LLC*, 648 B.R. 137, 140 (Bankr. S.D.N.Y. 2023). Conversely, the "Rent Approach," which Appellant argues the Bankruptcy Court should have applied, imposes a cap equal to 15 percent of the *total dollar amount of the rent* that would be payable for the entire remaining term of the lease, so long as that dollar amount is at least equal to the rent reserved for one year rent and does not exceed the rent reserved for the next three years of the lease

---

(Bankr. D. Me. 1991); *In re McSheridan*, 184 B.R. 91, 102 (B.A.P. 9th Cir. 1995), *overruled on other grounds by Saddleback Valley Cmty. Church v. El Toro Materials Co.*, 504 F.3d 978 (9th Cir. 2007). It thus cannot credibly be argued that Section 502(b)(6) is limited in its application only to leases that terminate pursuant to state law.

12

term.  Appellant Br. at 14.

Significantly, the Time Approach imposes a cap that is based on the rents that are specified for the first 15% of the remaining lease term (not to exceed three years), and it thereby ignores rent escalations that would occur in later years.  *Cortlandt*, 648 B.R. at 140.  The Rent Approach, by contrast, imposes a cap that is based on 15% of all the dollar amount of rents that are specified for the entire remaining least term (not to exceed three years).  *Id*.  The Rent Approach thereby captures an element of rent escalations that the Time Approach does not capture, and in doing so it may result in a higher cap on the relevant parts of a landlord's claim.  *Id*.

Courts throughout the country uniformly recognize the two competing approaches.  The difference in the approaches has to do with whether the "for the greater of one year, or 15 percent, not to exceed three years of the remaining term of such lease" language speaks in terms of time ("Time Approach") or speaks in terms of rent ("Rent Approach").  In other words, the question posed between the two approaches is: "Do we interpret that language to be referring to rent *dollar amounts* or *periods of time*?"  According to a leading bankruptcy treatise, "The 15 percent limitation of section 502(b)(6) speaks *in terms of time, not in terms of rent* . . . Grammatically, the 'greater of' phrase contemplates two time periods, one year and 15 percent of the remaining term.  But the latter period (15 percent of the remaining term) is further limited to three years, so that if the remaining lease term exceeds 20 years, the allowable damage claim will not increase."  4 COLLIER ON BANKRUPTCY ¶ 502.03[7][c] (16th ed. 2022) (emphasis added).

Both parties—and the Bankruptcy Court—have acknowledged a clear divide in district court opinions on the proper approach to apply to the "Cap."  Appellant Br. at 14; Appellee Br. at 22; *Cortlandt*, 648 B.R. at 140.  Appellant's primary argument is that the Bankruptcy Court's decision goes against "the established cases in the Southern District of New York which have all adopted the 'rent approach' over the 'time approach.' "  Appellant Br. 4.  However, as Appellee

correctly points out, the Bankruptcy Court did not decide to part with prior "precedent" lightly. Appellee Br. at 22. In explaining the reasoning behind the 502(b)(6) Computation Order, Judge Wiles carefully laid out and analyzed—in detail—the history of the Rent Approach in Bankruptcy Court decisions in the Southern District of New York. *Cortlandt*, 648 B.R. at 138–144. Judge Wiles explained that the Rent Approach was first applied in the Southern District Bankruptcy Court in a 1993 case, *In re Financial News Network, Inc.*, 149 B.R. 348, 351 (Bankr. S.D.N.Y. 1993), without any discussion of the alternative approach and where, in fact, the competing approaches were not even at issue. *Id*. After *Financial News Network*, our bankruptcy courts simply continued to summarily apply the Rent Approach on precedential grounds and largely without any analysis of the two competing approaches. *Id*. at 140; *see e.g.*, *In re Andover Togs, Inc.*, 231 B.R. 521, 547 (Bankr. S.D.N.Y, 1999). However, as Judge Wiles noted, there have been no decisions in this District with respect to this issue since 2011. *See In re Rock & Republic Enters.*, 2011 WL 2471000 (Bankr. S.D.N.Y. Jun. 20, 2011).

After acknowledging this precedential history, Judge Wiles emphasized that in the ten years since the last Southern District decision in *Rock & Republic Enterprises, Inc.*, the weight of the relevant authorities throughout the country has shifted very strongly in favor of the Time Approach. *See Cortlandt*, 648 B.R. at 141. Indeed, the *Collier's Treatise* (which Appellant concedes is "the leading and most respected and influential authority on the Bankruptcy Code and bankruptcy law," *see* Appellant Br. at 9) now also endorses the Time Approach rather than the Rent Approach. *See* 4 COLLIER ON BANKRUPTCY ¶ 502.03[7][c] (16th ed. 2022). Other authorities on bankruptcy law also endorse the Time Approach. *See, e.g.*, American Bankruptcy Institute Commission to Study the Reform of Chapter 11, ISBN: 978-1-937651-84-8, Section V.A.6, pp. 129-30, 135 (concluding that the Time Approach as the correct way to calculate the 502(b)(6) cap); S. Deshpande, *A Fresh Look at the Bankruptcy Code's Limitation on Landlords'*

14

*Rejection Claims*, 2011 Ann. Surv. Of Bankr. Law 11 (2011) (concluding that the Time Approach represents the correct interpretation of the statute).

After emphasizing the ever-growing consensus among other district courts and bankruptcy law authorities, Judge Wiles conducted his own, independent analysis of Section 502(b)(6)'s statutory language and legislative history, and ultimately came to the well-reasoned decision that the Time Approach was the correct interpretation of Section 502(b)(6). *Cortlandt*, 648 B.R. at 138–144.

The Court agrees with the Bankruptcy Court's holding that the damages cap should be calculated using the Time Approach rather than the Rent Approach. By its plain language, the statutory cap speaks in terms of time and not dollar amounts. The result is to impose a limit on allowable damages that is computed by reference to *a period of time*. That period of time is equal to one year or 15 percent of the remaining term of the lease, so long as that period is more than one year but less than three years. Therefore, damages available to a lessor for termination of a lease are capped at the greater of either (1) one full year, or (2) 15% of the remaining lease period up to three years. The Time Approach is not only consistent with the plain language of Section 502, but also with the legislative history of the statute and the emerging consensus of relevant authorities.

### III. The Bankruptcy Court Correctly Held That the Proceeds of the Letter of Credit Should Be Applied to Further Reduce Appellant's Capped Claim.

Appellant also argues that the Bankruptcy Court separately erred in holding that the proceeds of the Letter of Credit that had been obtained by Tenant as Applicant, and provided to Appellant as Beneficiary, should be applied in further reduction of the capped allowable amount of the Landlord's Claim. Appellant Br. at 12. Specifically, the Bankruptcy Court found that "uncontroverted evidence" established the Letter of Credit was satisfied *with estate assets* pursuant

to the Debtors' Plan, and thus, such Letter of Credit should be deducted from Appellant's Claim to reduce such claim after the Section 502(b)(6) calculation is complete.  Interim Order at 9.

Appellant concedes that "bankruptcy courts have often held that letters of credit provided by debtor tenants should be treated in the same way as security deposits provided by debtor tenants and, therefore, should be applied in further reduction of the capped and limited allowed amount of the landlord claims."  Appellant Br. at 12; *see also In re AB Liquidating Corp.*, 416 F.3d 961, 965 (9th Cir. 2005) (affirming district court's application of letter of credit to landlord's allowable claim rather than its gross damages); *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 208 (3d Cir. 2003) (landlord's capped claim must be further reduced by application of letter of credit where parties intended the letter of credit to act as a security deposit); *In re Mayan Networks Corp.*, 306 B.R. 295, 301 (B.A.P. 9th Cir. 2004) (applying letter of credit to reduced capped claim and noting that the appropriate analysis "looks to the impact the draw upon the letter of credit has on property of the estate.").  However, Appellant argues that such principle is not applicable here, where Tenant was the one that obtained the Letter of Credit and provided it to Appellant, and Tenant was *not* one of the Debtors in the Chapter 11 Cases.  Appellant Br. at 12.  The Court disagrees.

In finding that the Letter of Credit should be deducted from Appellant's Claim after the Section 502(b)(6) cap is applied, the Bankruptcy Court cited "uncontroverted evidence" which established that the Letter of Credit was satisfied with *estate assets pursuant to the Debtors' Plan*.  Interim Order at 9.  Appellant counters that "[t]his was a clear misunderstanding and misinterpretation of the 'uncontroverted evidence,' " which Appellant submits merely demonstrated that Appellant was the Beneficiary, Tenant was the Applicant, and the issuing bank (JPMorgan) was the direct and only obligor on the Letter of Credit.  Appellant Br. at 13.  In reviewing the Bankruptcy Court's findings of fact for "clear error," *Bayshore Wire Prods.*, 209 F.3d at 103, the Court finds none.  An email sent *from* JPMorgan *to* Guarantor-Debtor expressly

16

identifies the Tenant as "Applicant," *Debtor-Guarantor as "Obligor,"* and Appellant as "Beneficiary" for the Letter of Credit. *See* Appellee Br., Ex. 1 at PAA-223.

The Court is also not persuaded by Appellant's argument that "[i]f any of the [] Debtors were also obligated to reimburse [JPMorgan] for any drawings [under the Letter of Credit], such is a matter as between [JPMorgan] and the [] Debtors, having nothing to do with the rights and obligations as between Appellant and Tenant." Appellant Br. at 13. Such a holding would lead to duplicate claims against the Debtors from Appellant and JPMorgan. *See Mayan Networks Corp.*, 306 B.R. at 299 (allowing full amount of a claim without application of letter of credit held as security for lease would result in claims against the estate from both the landlord and the issuing bank). As the *Mayan Network* Court further reasoned, failing to apply the Letter of Credit posted as security for the lease would also result in an "end run" around the Section 502(b)(6) damages cap. That is, of course, precisely what Appellant improperly is hoping to do here.

The Court finds that the Bankruptcy Court did not err in holding that the Letter of Credit should be deducted from Appellant's Claim after the Section 502(b)(6) calculation is complete.

### IV. The Bankruptcy Court Correctly Held That Store Cleanup Costs are Subject to the Damages Cap in Section 502(b)(6).

Finally, Appellant argues that the Bankruptcy Court erred in holding that costs incurred by Appellant to clean up the store after Tenant vacated ("Cleanup Costs") are subject to the Section 502(b)(6) damages cap. Appellant Br. at 15. As discussed, Section 502(b)(6) limits a claim for damages "resulting from" the termination of a lease to a portion of the "rent reserved" under such lease. 11 U.S.C. § 502(b)(6). In deciding whether the Cleanup Costs "result[ed] from" the termination of the Lease, the Bankruptcy Court applied a test adopted by the Ninth Circuit in *Saddleback Valley Cmty. Church v. El Toro Materials Co. (In re El Toro Materials Co.)*, 504 F.3d 978, 980–981 (9th Cir. 2007), which asks: "Assuming all other conditions remain constant, would

the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?" *Cortlandt*, 648 B.R. at 144; *see also In re Rock & Republic Enters.*, 2011 WL 2471000, at *25 (citing *In re El Toro Materials Co.*, 504 F.3d at 980–981). Although Appellant argues that the Bankruptcy Court's "reliance on *El Toro* is totally misplaced," it provides no case law (or citations at all for that matter) in support of its argument. Appellant Br. at 15. Instead, Appellant attempts to clumsily distinguish the cleanup costs in *El Toro* from the Cleanup Costs in this case. Appellant Br. at 15. Finding no controlling case law to the contrary and finding other Southern District of New York cases that have similarly applied the *El Toro* test, the Court finds no error in the Bankruptcy Court's application of the *El Toro* test to determine whether certain damages arose "from the termination" of a Lease. *See e.g.*, *In re Rock & Republic Enterprises, Inc.*, No. 10-11728 (AJG), 2011 WL 2471000, at *25 (Bankr. S.D.N.Y. June 20, 2011). Moreover, in the absence of Second Circuit precedent, the Court finds the Ninth Circuit's test persuasive.

To that end, the Bankruptcy Court noted that the parties' Lease expressly states: "*[u]pon* expiration *or other termination of this Lease*, Tenant shall quit and surrender to Landlord the Premises, vacant, broom clean, in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted . . . ." *Cortlandt*, 648 B.R. at 144–45 (emphasis in original). Thus, under the *El Toro* test, Appellant would not have a claim for Cleanup Costs if the lease had not been terminated. *See El Toro*, 504 F.3d at 980–981. Accordingly, any claim for store Cleanup Costs *arose from the termination* of the Lease, and therefore, is indeed subject to the Section 502(b)(6) cap.

## **CONCLUSION**

Based on the foregoing, the Order of the Bankruptcy Court sustaining the objection to Claim 1066 is AFFIRMED in its entirety. The Clerk of Court is respectfully requested to close the case.

**SO ORDERED.**

Date: **March 26, 2024**             _/s/ Mary Kay Vyskocil_
     **New York, NY**               **MARY KAY VYSKOCIL**
                                             **United States District Judge**